## Southern Insurance Company, et al. v. Milligan.

(Decided June 3, 1913.)

Appeal from Butler Circuit Court.

1.  Corporations—Subscriptions for Stock—Right of Subscriber to Rescind for Fraud.—Representations made by an agent of a corporation to induce a person to subscribe for stock where they consist merely of expressions of opinion as to the future pros-

pects of the company and the future value of the stock, are not sufficient to authorize a cancellation of subscription for fraud, although the future condition of the corporation does not fulfill the promises of the agent.

2. Corporations—Subscriptions for Stock—Right to Cancel for False Representations Contained in Papers Issued by Coporation. —Where a corporation issues public statements concerning its assets and liabilities and on the faith of these statements a person who is induced to subscribe for stock, may obtain a cancellation of his contract if it turns out that the representations contained in the paper were false or misleading in material respects.

3. Corporations—Subscriptions for Stock—False Statements as to Surplus.—A statement on a subscription paper that the corporation has a surplus fund in a designated amount, if false. is sufficient to justify a rescission of the contract.

4. Corporations—Bound by Representations Made by Agent in Obtaining Subscriptions for Stock—Right of Purchaser to Rescind if Representations False.—An agent of a corporation who solicits subscriptions for stock, speaks for the corporation, and it is bound by all the representations that he makes concerning the stock he has for sale, and if his representations are false in material respects, the purchaser may have a cancellation of his contract.

5. Corporations—Subscriptions for Stock—Right of Purchaser to Cancellation of Contract.—The false representations that will authorize a cancellation of stock subscriptions must be in reference to past or present conditions and not be mere expressions of opinion as to what the future prospects of the corporation are.

6. Corporations—Subscriptions for Stock—Knowledge of Purchaser That Representations of Agent Are Not True—Right to Rely on Representations.—A person desiring to subscribe for stock, and who is ignorant of the condition of the corporation, may rely on material and reasonable representations made to him by the agent and is not obliged to seek information from other sources or make any effort to verify the truth of the representations made by the agent, but a party who is in possession of information that the representations made by the agent are not true, or who has been put on notice as to their falsity, will not be heard to say that he was induced by the false representations to subscribe for the stock.

7. Corporations—Subscriptions for Stock—False Representation of Agent as to Other Purchasers and Dividends That Will Be Paid. —Where a party has been induced to purchase stock upon false representations made by the agent of the corporation that influential and well known citizens had purchased stock, or that the corporation is paying dividends, may have a cancellation of the contract.

8. Banks.—Where a bank discounts commercial paper before its maturity in the ordinary course of business, and without notice of any infirmity in the paper; it will not be affected by a fraud

practiced in the execution of the paper or by the fact that the contract between the maker and the payee of the contract has been cancelled for fraud.

9. Fraud—Action to Set Aside Contract for—Specifications of .Petition.—Where the petition in an action to set aside a contract on the ground of fraud, specifies the particular fraud relied on, the plaintiff will be confined to evidence in support of his specifications.

W. A. HELM, LOGAN & HAZELIP for appellant Southern Insurance Company.

HERDMAN & GARDNER for appellant Woodbury Deposit Bank. G. V. WILLIS, N. T. HOWARD for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming in Part and Reversing in Part.

On September 7, 1911, the appellee, Milligan, subscribed for one hundred shares of the capital stock of the appellant, Southern Insurance Company, and signed two subscription papers, each being for fifty shares of stock and. each a duplicate of the other except as to the maturity of the notes given by appellee in payment of the subscription. The subscription paper reads:

"Stock subscribed to the Southern Insurance Co., Nashville, Tenn. Par value of each share, ten dollars. Surplus on each share, twenty dollars. Authorized capital stock, five hundred thousand dollars. · I, G. H. Milligan, of Round Hill, Ky., hereby subscribe for fifty shares of the capital stock of the Southern Insurance Co., to be fully paid and non-assessable, for which I agree to pay fifteen hundred dollars, being at the rate of $30 a share. No certificate of stock shall be issued until the company has received payment in full for the shares herein subscribed for at the prices named herein. No conditions or agreements other than those printed and written herein shall be binding on the company. This subscription is subject to acceptance by the company. Payments to be made; fifteen hundred dollar note to be paid on or before March 7, 1913. Witness A. A. Streit. Date, Sept. 7, 1911."

The two notes executed by appellee were worded the same except as to the time of payment, each note being for fifteen hundred dollars, one maturing six months after date and the other twelve months after date. A few days after the execution of these notes, they were purchased from the Insurance Company, in the regular

course of business, by the Woodbury Deposit Bank, and soon thereafter there was issued to appellee two certificates of stock in the Insurance Company, each showing that he was the owner of "fifty shares of ten dollars each of the capital stock" of the Insurance Company.

In November, 1911, appellee brought this suit against the Insurance Company and the Woodbury Deposit Bank, tendering to the company the certificates of stock issued and asking that the notes executed by him be canceled, and that the Wodbury Deposit Bank and the Insurance Company be restrained from transferring or disposing of the notes.

This relief was sought upon the ground that A. A. Streit, the agent of the Insurance Company with whom the contract was made, at the time of the transaction falsely and fraudulently represented that the par value of the stock that would be delivered would be three thousand dollars, when in fact the par value of the stock was one thousand dollars; and that the Insurance Company was paying an annual dividend of 27 per cent on the stock, when in fact it had never paid any dividend; and that John M. Carson and others had purchased stock in the company, when in truth Carson had never purchased any stock; and that the value of the stock would double in twelve months; and that the price of the stock would advance and that if he did not buy at once he could not get it later at $30 a share, when in fact the stock both after and since had been sold by the company at less than $30, a share.

He further averred that when the contract was entered into he had no information, and no means of obtaining information, except from the agent Streit as to the truth of any of the representations that he made, and that he was induced by these representations to enter into the contract.

For answer to this petition the Insurance Company denied that its agent made any false or fraudulent representations to appellee, or that appellee was induced to enter into the contract by reason of any false representations or statements made by the agent. It further set up that appellee, at the time he subscribed for the stock, was fully advised of the condition of the company and the value of the stock, and there was no fraud or overreaching or misrepresentation practiced in selling the stock to him.

The Woodbury Deposit Bank also filed an answer in which it asserted that it purchased the notes in good faith, for a valuable consideration, before maturity, and asked that it be protected in its purchase.

Upon hearing the case the lower court entered a judgment cancelling the notes and also the certificates of stock, as well as the certificates of deposit issued by the Woodbury Deposit Bank to the Insurance Company. From this judgment the Insurance Company and the bank prosecute this appeal.

No person was present when the sale of the stock to appellee was made except himself and the agent Streit. Appellee testifies that Streit, who was a stranger to him, came with a letter of introduction from his friend, Dr. Cherry. That Streit showed him papers and circulars setting forth the standing of the company, and told him that John M. Carson and others had bought stock, and that the stock would double itself in value in twelve months, and was worth $30 a share; that the stock was non-assessable and was paying 27 per cent dividend, not on the par value of the stock, but on the investment, and that the company would pay the next dividend in January, 1912; that he bought one-hundred shares and was to pay $30 per share for it, and was under the impression when he bought the stock that the par value of the stock was $30 per share, and did not learn that it was only $10 per share until sometime later; that at the time he bought the stock, he did not have any means or opportunity of learning the value of the stock or the financial condition of the company, or of ascertaining the truth of what Streit told him and relied on the representations made by Streit.

A. A. Streit testified that he was selling stock for the company, and that he told appellee that the company was in a position to pay a dividend the first of January, but did not tell him it would do so; and further told him that the company was on a gross earning basis of 27 per cent on the par value of the stock, and that as near as he could figure from the statements the dividends would be 12 per cent or 15 per cent on the par value, but that the matter of paying dividends was entirely with the board of directors. He further said that he did not tell him that the stock would double in value in twelve months, but did tell him that John M. Carson had taken 25 shares of stock.

John M. Carson testifies that Streit tried to get him to purchase some of the stock, but that he declined to take any of it.

It is also shown by the evidence that the company, although a solvent and going concern when the transaction was had with appellee and when the evidence was taken in May, 1912, had never declared or paid any dividends, and although it had a paid-up capital stock of $166,450, its surplus fund in 1911 was only $17,533.13.

It will thus be seen that there is not material difference between the evidence of appellee and Streit as to the representations made by Streit in regard to dividends, and it appears without contradiction that Carson had not purchased any stock in the company and that the company had never paid any dividends.

We may put aside as not controlling the representations made by Streit as to the future prospects of the company and the future value of its stock. These representations fall within the general rule—to which, however, there are some exceptions—that representations made by an agent under circumstances like those shown in this case will be treated as mere expressions of opinion, not having sufficient weight to induce the purchaser to make the investment.

It is also said by counsel for the Insurance Company that any representations made by Streit that the par value of the stock was $30, or that the stock was worth $30, should be put aside because they contradict the written contract delivered by Streit to appellee, and which shows on its face that the par value of the stock was only $10 per share. It is true that the paper designated "subscription for stock" signed by appellee, and which may be treated as the contract between the parties, contained on its face the words "par value of each share, $10," but immediately under these words are the further words "surplus on each share, $20." So that, although appellee could not say in contradiction of this paper that he believed the par value of each share was $30, it is yet apparent that the statement that the surplus on each share was $20, was calculated to mislead and deceive a purchaser into the belief that the actual value of the shares was in fact $30, when in truth the actual value was less than $12, as the surplus was less than $2 a share in place of $20.

Corporations that issue public statements concerning their assets and liabilities with the purpose of in-

ducing subscriptions to the capital stock should carefully abstain from making any false or deceptive representations in respect to these material matters. The public generally who invest money in corporate stocks and securities are almost necessarily limited in their information as to the financial condition of the corporation to the papers and circulars that it distributes for the information of the investing public; and while corporations are not ordinarily to be held accountable for expressions of opinion as to the future prosperity of the concern, the defrauded purchaser who subscribes for stock should not be defeated in his efforts to obtain a cancellation of his subscription when it is made to appear that he made the purchase on the faith of the truthfulness of statements published by the corporation showing its then financial condition. Prewitt v. Trimble, 92 Ky., 176; Oil City Land & Improvement Co. v. Porter, 99 Ky., 254; Weissinger Tobacco Co. v. Van Buren, 135 Ky., 759; Allen v. Neale, 134 Ky., 690; Long v. Doughitt, 142 Ky., 427.

We also think that a statement on a subscription paper that the corporation has a surplus fund in a designated amount is intended to convey to purchasers the idea that the corporation has in fact a bona fide surplus in the amount specified, and this statement would undoubtedly have weighty influence in inducing a contemplated purchaser to subscribe for stock, as he would naturally and reasonably believe that the par value of each share of stock was enhanced in value in the amount specified as surplus. The word ''surplus'' in the connection it was used on this subscription paper might reasonably and naturally be understood to mean that the corporation had money or property of value equal to the amount designated as surplus and that its capital stock was enhanced in the amount of this sum.

Taking these propositions as a basis it is strongly urged by counsel for appellee that the misleading and deceptive statement as to the surplus on the face of the subscription paper is in itself a sufficient reason for cancelling the contract on the ground that it was obtained by fraud, and we would be inclined to accept this view if the pleadings of appellee were sufficiently broad to justify us in putting the decision on this ground, but as the petition states distinctly the fraudulent representations relied on, and does not include the one mentioned, we must pass it without further notice.

Coming now to the representations made by the agent independent of the writing, we find it virtually admitted that he did represent that the Insurance Company was on a large dividend-paying basis and that John M. Carson had subscribed for stock in the company. The argument is made in behalf of the Insurance Company that these representations of the agent should not be considered as having a controlling influence in inducing appellee to purchase the stock, and, therefore, do not furnish sufficient grounds for a cancellation of the contract. But we do not agree with counsel in this position. There is really no dissent in the authorities that the agent of a corporation to solicit subscriptions speaks for the corporation, and it is bound by all the representations that he makes concerning the stock he has for sale. It is equally well-settled that a person desiring to subscribe for stock, and who is ignorant of the condition of the corporation, may rely on material and apparently reasonable representations made to him by the agent concerning the value of the stock, the solvency of the corporation and other existing matters relating to its business, management and affairs, and is not obilged to seek information from other sources or make any effort to verify the truth of the representations made by the agent.

Another generally accepted rule is that a party will not be heard to say that he was induced by the false representations of an agent to subscribe for stock when he is in the possession of information that the representations made by the agent are not true, or has been put on notice as to their falsity. It is also held, with few exceptions, that the false representations that will authorize a cancellation of stock subscriptions must be in reference to past or present conditions and not be mere expressions of opinions as to what the future prospects of the corporation are. Thompson on Corporations, Vol. 1, Sec. 714-732; Cook on Corporations, Vol. 1, Sec. 136-153, 349-357; German National Bank v. Nagel, 26 Ky. Law Rep., 748; Perkins v. Embry, 24 Ky. Law Rep., 1990; First National Bank of Stanford v. Mattingly, 92 Ky., 650; Southern Development Co. v. Silva, 125 U. S., 247, 31 Law Ed., 678.

Applying now these principles to the facts of this case, we have no difficulty in reaching the conclusion that the agent did make material as well as false representations concerning the value of the stock and the con-

dition of the Insurance Company to appellee, and that the representations exercised a controlling influence in inducing him to buy the stock.

Appellee knew nothing about the condition of the Insurance Company before he met the agent, and the transaction was closed within a few hours after appellee first met and became acquainted with him. During the negotiations that resulted in the purchase of the stock, appellee had no means or opportunity of learning anything about the value of the stock or the condition of the company except from the agent and the papers he furnished nor was there anything connected with the transaction that would put him on notice that the representations made by the agent or contained in the papers were not true. The agent came to him with a letter of introduction from a friend, and all of the representations that he made were reasonable and were of a nature calculated to induce an ordinarily prudent business man to invest in the enterprise. The agent told him, for example, that John M. Carson, who, it appears, was a well-known and good business man in that community, had subscribed for stock.

It is a matter of common knowledge that persons who are approached with propositions relating to the investment of money are frequently influenced to either make or decline the investment by knowledge of what some friend or neighbor or acquaintance, in whose business ability they have confidence, has done in reference to the same character of investment. That agents soliciting subscriptions to stock appreciate the value of being able to tell persons they desire to trade with that this or that influential man in the community has made a like investment, is well illustrated by what took place in this case. Carson testifies that,

"Streit said to me that if I would buy some of his stock, as well as I can remember, as much as $250 worth, and would use my influence to aid him in disposing of the stock to other persons, that he would allow me one dollar for each share we sold," and that "if it did not suit me to pay for the stock, the company would give me as much time as I would want, and if I was not then ready to pay for it, he would see that the time was extended without troubling me, and that he made that offer as an inducement for me to purchase some stock so that he could use my name with people as having purchased it."

The false statement made by the agent in reference to Carson related to a fact that had passed, and was obviously made for the purpose of inducing appellee to purchase stock, and that it did have large influence in obtaining the subscription, we have no doubt. Coles v. Kennedy, 81 Ia., 360; 25 Am. St. Rep., 503.

A further false and material statement relating to an existing fact was made by the agent when he told appellee that the company was paying 27 per cent on the investment, and so closely connected with this as to make it almost a false statement of an existing fact, was the representation that the company would pay a dividend in January, 1912.

It of course needs no argument to demonstrate that an agent proposing to sell stock could not make any representations concerning it that would be more attractive to a prospective purchaser than the statement that it was paying and would pay large dividends, and it is not to be doubted that the representations the agent made to appellee in reference to the dividends this corporation had and would pay had a controlling influence in inducing him to purchase the stock. But passing the representations as to the dividend that the company would pay in January, 1912, the false representation concerning the dividend the company was paying at the time the contract was entered into is sufficient in itself to justify a cancellation of the contract.

On the appeal of the bank the evidence shows that the notes executed by appellee to the Insurance Company were purchased and discounted by the bank before the maturity of the notes, and in the ordinary course of business, without notice on the part of the bank of any infirmity in the notes. It is shown that the bank did not pay the proceeds of the notes to the Insurance Company but retained it as a time deposit, issuing to the Insurance Company certificates of deposit. Under these facts the purchase by the bank of the notes is not affected by the cancellation of the contract between appellee and the Insurance Company, but appellee in the transaction with the bank takes the place of the Insurance Company. In other words, he is entitled to the benefits of the certificates of deposit issued by the bank to it, and so when the certificates of deposit fall due, he will be entitled to receive from the bank the amount of money represented by them.

Wherefore, the judgment on the appeal of the Insurance Company is affirmed, and on the appeal of the bank is reversed, with directions to enter a judgment not inconsistent with this opinion.