# Farmers Bank of Lynnville v. First National Bank of Dickson.

## Same v. S. H. Boyd.

## Same v. J. S. Boyd.

## Same v. Orie Boyd.

(Decided May 7, 1915.)

## Appeals from Graves Circuit Court.

1. Bills and Notes—Negotiable Instruments Act—Commercial Paper—Infirmity—Notice of.—Under the terms of the Negotiable Instruments Act prescribing what shall constitute notice of an infirmity in commercial paper, the mere fact that the cashier of a bank at which the paper was negotiated had notice that it was executed in consideration of the sale of life insurance stock, and that the cashier according to a previous arrangement with the seller received a small commission out of the proceeds of the note for having furnished a list of names to the seller of persons in the vicinity financially responsible, was not sufficient to constitute notice of infirmity or to show upon the part of the cashier knowledge of such facts as would amount to bad faith.

2. Bills and Notes—Commercial Paper—Defenses—Bad Faith.—The purpose of the statute was to place commercial paper on such footing that it would be fully and freely accepted without question in all commercial transactions and thereby facilitate trade, and with that purpose in view to protect the holder for value before maturity from any defenses that might exist between the payor and payee, unless the holder before negotiation had knowledge of such defense or infirmity or was in possession of such facts as would make his negotiation of the paper amount to bad faith.

3. Bills and Notes—Commercial Paper—Holder of—Good Faith.—An insignificant circumstance such as the receipt of a small fee by the cashier of a bank for furnishing to the seller names of responsible parties, unsupported by other evidence, is insufficient to authorize a jury to find that commercial paper was not negotiated in good faith by the holder in due course.

HESTER & HESTER and GUS THOMAS for appellant.

ROBBINS & ROBBINS and J. A. CLEMENTS for appellees, National Bank of Dickson.

W. J. WEBB for appellees, J. S. Boyd, S. H. Boyd and Orie Boyd.

OPINION OF THE COURT BY JUDGE TURNER—Affirming the first-named appeal, and reversing each of the others.

These four appeals grew out of the same transactions, and as they were consolidated in the lower court, they will be passed upon together here.

The three appeals in which the Boyds are appellees present precisely the same questions and will be first disposed of.

On the 7th of August, 1912, one W. C. Lacy sold to each of the Boyds four shares of the capital stock of the Tennessee Life Insurance Company at the price of $250 per share, each of them executing to Lacy his note, for $1,000 payable the 1st of January, 1913, and bearing interest from date.

Lacy seems not to have been acquainted in the vicinity where he sold this stock, and before selling it he went to Caldwell, the cashier of the Farmers Bank of Lynnville, and told him the nature of his business and requested that he give to him a list of names of persons in that vicinity who were financially responsible, to aid him in the sale of the stock; the cashier, Caldwell, after inquiring from him the kind of stock he was selling, and believing from the statements of Lacy that it was a good proposition, gave him the list of names, which included the Boyds, as well as the names of two of Caldwell's relatives and some of the stockholders in the bank of which he was cashier. At the time Lacy voluntarily offered to give to Caldwell a commission of $5.00 per share for each share of stock which might be sold to such persons, and arranged with Caldwell, after consultation by Caldwell with the members of the finance committee of his bank, to discount with the bank any paper which might be received by him (Lacy) in payment for such stock, the rate of discount to be two per cent. from the face of the paper, which was to bear six per cent interest from its date, or an equivalent of an eight per cent discount, and in addition thereto to give to Caldwell his commission of $5.00 per share.

On the day the three notes were executed they were endorsed by Lacy and discounted to the bank, the two per cent. discount being taken from the face of the notes and the $5.00 per share being paid to Caldwell, and Caldwell issued to Lacy, in accordance with their previous arrangement, certificates of deposit aggregating $2,880, bearing interest at the rate of three per cent. At about 10 o'clock A. M. on the morning of the 13th of August these certificates of deposit were assigned and transferred before maturity, and in due course of busi-

ness for a valuable consideration to the First National Bank of Dickson, Tennessee.

The Boyds having become dissatisfied with their trade, and having received, as alleged, information to the effect that the stock was not as valuable as it had been represented, and that a fraud had been practiced upon them, on the 13th of August instituted in the Graves Circuit Court their three separate actions against Lacy, seeking to have the notes so executed by them cancelled, procured certain attachments to issue against the fund supposed to be on deposit by Lacy in the Farmers Bank of Lynnville.

Thereafter the Farmers Bank of Lynnville instituted actions against the three Boyds upon their notes, and the First National Bank of Dickson, Tenn., an action against the Farmers Bank of Lynnville on the three certificates of deposit.

The three actions of the Farmers Bank of Lynnville against the Boyds were tried together and the jury returned a verdict for the defendants, upon which judgment was entered. Thereafter the court entered a judgment in favor of the First National Bank of Dickson against the Farmers Bank of Lynnville upon the three certificates of deposit, and from those two judgments these four appeals are prosecuted by the Farmers Bank of Lynnville.

The answer of the Boyds admitted the execution of the notes, but charged a failure of consideration and a fraud practiced upon them by Lacy, and that the bank and its officers at the time the notes were discounted had actual knowledge of such failure of consideration and of the fraud so practiced by Lacy. These allegations were put in issue by denials in the reply.

So that the only issues were whether there had been fraud practiced by Lacy in procuring the notes, and, if so, did the bank or its officers prior to the discounting of the notes have actual knowledge thereof or knowledge of such facts that their action in discounting the same amounted to bad faith.

Our Negotiable Instruments Act, Section 3720b, Kentucky Statutes, Sub-section 52, defines a holder in due course as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"(1) That the instrument is complete and regular upon its face.

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.

"(3) That he took it in good faith and for value.

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Sub-section 56 of the same act prescribes what shall constitute notice of an infirmity, in the following language:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The chief ground urged for reversal in the three Boyd cases is that there was a total failure of evidence to show that the bank, prior to the discounting of the notes, had any actual knowledge of the fraud of Lacy or any knowledge of such facts as would have amounted to bad faith upon its part, and this contention involves a statement of the evidence on those issues.

The evidence of Caldwell as to the transactions between him and Lacy, both before and at the time of the discounting of the notes, is as follows:

"Mr. Judson Pigue came to Lynnville a week before him and Lacy came, and introduced himself to me. I never had met him before, and he told me that he and Mr. Lacy had been working at Water Valley section selling insurance stock, Lacy was, and he carried him, and that they were about through down there, and they wanted to come up in our country, in our neighborhood, and work some up there, and wanted to know if the bank would handle some notes, provided they sold any stock, and that when they did they would put the money on time deposit, us issuing them a certificate of deposit bearing three per cent. interest; I told him that I was quite sure we would, we had bought some from Mr. Hooper; he informed me that Mr. Hooper was Mr. Lacy's partner, and that I would let him know when he and Mr. Lacy came back, that I would have to see the balance of the financial committee; I saw them, told them the circumstances; and also, Mr. Pigue wanted to know what part of his mission was to know what rate

of interest we were charging; I told him we would handle them at the same rate we handled those others that we bought from Hooper; one of them was on Mr. Stevens for $1,050.00, and one was Mr. Austin for $300.00; each note was bearing six per cent. interest from date, and we discounted the note two per cent. per annum from the face, and that we would handle these, provided he secured notes that were satisfactory to the bank, at the same rate. On Monday following Mr. Lacy and Mr. Pigue came to Lynnville; came in, I met Mr. Lacy, and he showed me his insurance proposition, and insisted that I buy some. I told him that I had already bought some life insurance stock in another company and that I was not financially able to buy more; and so that afternoon he and Mr. Pigue went to see Dr. Shelton and Mr. Stevens; now they were gone all day. The next day I gave Mr. Hooper a list of names. * * * Q. Hooper, you mean Lacy? A. Yes, Mr. Lacy. Mr. Lacy told me that when he went into a strange community he didn't know who was good, and able to buy life insurance, and who was not, and that he made it a practice of getting somebody to go with him or furnishing him a list of names, and that they usually gave it to the cashier an option on it, to get a chance at it, offered it to him, and further informed me that they gave the cashier at Water Valley the same proposition, and that was his offer to start with for these names, and if he sold any of the parties and if we handled the notes of course I was entitled to a commission for my information. So, on Tuesday morning I came to Mayfield, I didn't see Mr. Hooper and Mr. Pique any more, I mean Mr. Lacy and Mr. Pique; and about twelve o'clock that day Mr. Lacy called me over the phone here at the Farmers National Bank, and told me that he had sold all three of the Mr. Boyds four shares apiece, and that for me to get back as early as I could that day, that he wanted to go back to Water Valley. So I went home early, and when I got home, why I told Mr. Melton about the notes, he was one of the directors, also told Dr. Forrest; and that they were for a thousand dollars, and for insurance stock, just like Mr. Steven's, so they directed me to proceed by these notes at two per cent. discount per annum from the face of the note; the notes were bearing six per cent. interest from date, and we discounted the notes from the face two per cent., which would make eight

per cent. in all.  Well, I went on over to the bank; the boy, Boone Dick, that stayed in the bank that day, I think had closed up; it was somewhere about four or five o'clock in summer, in August; I got a key, went over and opened up, and we figured the discount from the notes, $3,000.00, which left me owing Mr. Lacy $2,940.00.  Now Mr. Lacy says, 'You take your commission off of that,' which I did; then he suggested that that left me owing him $2,880.00; he also suggested that I make them in three time deposits, two each of one thousand dollars and the other $880.00, which I did, bearing three per cent. interest.  Then, following that, Mr. Boyd was up in town that week, Mr. Verde Boyd, and asked me did we have the notes, I told him that we did, and he asked me how did we have them, and I told him that we had bought them, that Mr. Lacy had left the money on time deposit, due January the first.  So that is about all, I reckon that Mr. Boyd told me on that trip.  On Sunday then, following, I saw Mr. Orie Boyd at church and we talked about it again, and Orie at that time had become suspicious that they had made a bad trade, probably, and were going to investigate it, possibly had, and were going to further investigate it.  So, on Monday morning, following Sunday, Mr. Sonie Boyd came to Lynnville early, in a buggy, and told me, says, 'I want you to go to Mayfield with me, Mr. Webb wants you to bring them notes for the insurance stock, we are going to sue Lacy and attach these funds in this bank, we can get them before they get into the hands of an insurance officer, we will make him fix part of it.'  So I came to Mayfield, was here the day this suit was filed, and they garnisheed the bank; therefore, they kept us from paying these time deposits at maturity.  Q. What did you think about it, what did you know about it?  A. I didn't know anything about it, but it was a good proposition, looked like a good proposition to any man that had money to invest.  Q. From the representations that he made about it, you thought that it was a good proposition?  A. I told Mr. Pigue that the first time he was up there.  Q. Now then, when you gave that list, say whether or not you required them to pay you two per cent., or whether that was a voluntary proposition they made?  A. It was a voluntary proposition, I didn't require it; he offered that, said they would do it, paid someone in every community they went to.  I knew at

that time that Mr. Hooper had paid Dr. Shelton for such service. Q. Who is Dr. Shelton? A. Dr. Albert Shelton, him and his family one of the biggest stockholders in our bank, and we bought the notes from Hooper. Q. Pigue has told you that Dr. Shelton had been paid for his services in that matter? A. Yes, sir. Q. And they told you that the cashier at Water Valley had received two per cent, for furnishing names that he furnished? A. Yes, sir. Q. Say whether or not the notes were brought back to the bank, at that time did you know that Lacy had made any false or fraudulent statements to Mr. Boyd in order to get those notes? A. No, sir. Q. Did you have any information or belief that he had done so? A. No, sir. Did you believe that they were going to make any false statements to them to get them? A. No, sir; I didn't have any right to believe it.''

The testimony of Lacy is as follows:

''Q. Tell the jury what arrangement, what deal, or contract, you made with him with reference to selling some insurance stock, life insurance stock, and the bank handling the notes, and what you were to pay him for his part in selling; just tell what took place between you? A. Well, we went over to the bank, Mr. Pigue introduced me to him, he previously having been over there, and he said to me, Mr. Caldwell said to me that he would like to know a little something about the proposition before he gave us names of their customers and friends to go to see, and we explained it in a short way, and he said that was all right, and I told him I wanted to get the notes from him, take certificates of deposit for the same bearing any reasonable amount of interest; we had an agreement there and I believe we agreed on three per cent., and would pay him $5.00 per share for all the stock we sold, he was to furnish the names and handle the paper. Q. Who was to get this five dollars? A. The cashier was to get five dollars. Q. What was the arrangement with the bank as to what it was to do? A. I don't remember what that was; the bank got the interest on the notes, I believe, I wouldn't be positive, but I think ten per cent., and paid me back three per cent. Q. The notes were bearing interest, and they would take that, too, at the rate of six per cent? A. Yes, sir. Q. Did you have any talk with any of the other officers or did he counsel with any of the others while you were there? A. Not that I knew of; I believe

we talked to one man, I think, just a little, he had his money out and couldn't entertain the proposition.''

And this is the whole evidence in the record bearing upon whether the bank or its officers had actual knowledge of any fraud upon the part of Lacy, or of any circumstances from which bad faith upon its part might fairly be inferred. This evidence shows conclusively that Caldwell, the cashier, first demanded from Lacy to know the nature of his proposition before he would agree to give him the list of names which he sought; that he had previously dealt with Hooper, a partner of Lacy, about similar notes; that he previously himself invested in life insurance stock; and it is apparent, as testified by him, that he became convinced that Lacy's proposition was a good one. That he was so convinced seems conclusive from the fact that among the names so given by him to Lacy were those of two of his relatives as well as some of the stockholders in his bank.

It is true he knew that Lacy was selling life insurance stock, and he knew when he discounted the notes that they were given for such stock, but as to the value of that stock he only knew what Lacy had represented to him, just as the Boyds knew what had been represented to them.

But it is argued that because Lacy agreed to and did pay to Caldwell in his individual capacity the commission of $5.00 per share that he thereby became a partner of Lacy and a participant in the conspiracy to defraud the Boyds, and that his knowledge must be imputed to the bank. But the evidence shows that this was a voluntary offer upon the part of Lacy and that Caldwell was induced to accept this commission for furnishing the list of names by representation that it was a custom of Lacy's, and that other bank cashiers accepted such commissions under similar circumstances.

It is almost inconceivable that a man occupying the responsible position of a bank cashier would deliberately enter into a fraudulent conspiracy with a stranger, in consideration of a paltry commission or fee, to defraud his own relatives and his own business associates.

It is unnecessary to pass upon the question whether, under the facts of this case, the knowledge of the cashier is the knowledge of the bank, because there is absolutely no evidence that the cashier had any knowledge of any purpose upon the part of Lacy to perpetrate such

a fraud; nor are the circumstances such as would impute to the cashier the knowledge of any facts amounting to bad faith upon his part.

The case of Southern Insurance Company v. Milligan, 154 Ky., 216, relied upon by counsel for the Boyds, is in no sense applicable to this case. There the notes for the stock had been discounted by the bank, and a certificate of time deposit issued to the insurance company, but the company had not sold or disposed of the certificate of deposit, and the money was still on deposit in the bank; and the court merely held that the purchaser was entitled to a cancellation of his notes, and to be placed in the position of the insurance company and entitled to the benefit of the certificates of deposit.

It is true that the rate of discount might be so great that it would be strong presumptive evidence that the bank had notice of some infirmity in the paper; but the rate of eight per cent. discount in this case furnishes no such presumption.

It was the purpose of the statute to place commercial paper on such footing as that it would, in the interest of commerce, be fully and freely accepted without question in all commercial transactions, and thereby facilitate trade between the people, and to protect the holder for value before maturity from any defenses that might have existed between the payor and payee unless the holder before negotiation had knowledge of such defense or infirmity, or was in possession of such facts as would make the negotiation thereof amount to bad faith on his part. To hold that he was guilty of fraud under the evidence in this case would be to assume many things which do not appear from the evidence; to hold that he had "knowledge of such facts that his action in taking the instrument amounted to bad faith" would be to give undue and unwarranted importance to the circumstance that he was to receive a small commission on the sale of the stock for having furnished Lacy the list of names.

If such an insignificant circumstance, unsupported by other evidence, may be regarded as sufficient evidence to authorize a jury to find that commercial paper was not negotiated in good faith by the holder in due course, such paper will be regarded with suspicion always and the chief purpose of the statute will be defeated.

We are of opinion that the peremptory instruction asked for by the bank as against the Boyds should have been granted.

On the appeal of the Farmers Bank of Lynnville against the First National Bank of Dickson there is little difficulty; the certificates of deposit were negotiable paper; it is admitted that they were discounted to the Dickson bank even before the attachments were issued in the suit of the Boyds against Lacy; it is conclusively shown that they were discounted for a valuable consideration in the due course of business, and the right of the Dickson bank to recover on them cannot be doubted, and, in fact, there is no serious contention to the contrary.

For the reasons given, the judgments on the three appeals of the Farmers Bank of Lynnville against the Boyds are each reversed, with directions to grant appellant a new trial and for further proceedings consistent herewith; and the judgment upon the appeal of the Farmers Bank of Lynnville against the First National Bank of Dickson is affirmed.