## Harlin et al. v. Calvert's Administratrix.

(Decided March 23, 1934.)

JOHN E. RICHARDSON and SMITH & ELLIS, for appellants.

J. R. WHITE for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

From a judgment in favor of W. M. Calvert against the appellant J. H. Harlin in the sum of $1,000 with 6 per cent. interest thereon from June 22, 1931, until paid,

and sustaining the grounds of attachment against him and setting aside a conveyance from him to his wife and coappellant, Sadie F. Harlin, as being fraudulent and voluntary, and directing the property to be ·sold to satisfy Calvert's claim, this appeal is prosecuted.

After the rendition of the judgment, W. M. Calvert died intestate and the appellee, Lula Calvert, was appointed his administratrix. The cause has been duly revived in her name, but for the sake of brevity, the appellee will be referred to as W. M. Calvert, deceased. On the merits, the admirable opinion of the trial judge, Hon. Will Fulton, so succinctly states the issues, evidence, and applicable law, that it is hereby adopted as part of this opinion:

"For some years prior to June, 1931, J. H. Harlin was a director in the Trigg National Bank of Glasgow, and in the month of June, 1931, a three-cornered trade developed between the plaintiff [W. M. Calvert] and E. C. Witty and J. H. Harlin by which the defendant J. H. Harlin transferred to defendant Witty ten shares of stock of the Trigg National Bank, receiving from Witty a house and lot and assuming thereon an indebtedness of $1,500. Five shares of the stock thus transferred to Witty by Harlin were immediately transferred to plaintiff, Calvert, who, at the same time, deeded to Witty a house and lot valued at $1,000 in the trade. One Lykens, a real esate agent, was the intermediary in this trade and apparently was acting as agent for all three of the parties.

"The Trigg National Bank became insolvent in the early part of January, 1932, and ·the plaintiff, Calvert, was assessed $500, the par value of this stock, and brings this action against Witty and Harlin, alleging fraudulent representations by them in the sale of the stock to him.

"It is the contention of defendant Harlin that plaintiff cannot maintain this action, because there was no sale from Harlin to him; his contention being that he [Harlin] sold and transferred the stock to Witty and not to the plaintiff.

"The court is unable to sustain this contention on the part of defendant Harlin, because, while it is true that the stock was transferred on the books from Harlin to Witty, it is perfectly apparent from

the evidence that defendant Harlin knew that the entire trade was conditioned on plaintiff taking the five shares of stock, and for this reason the transaction was in effect, though not in form, identically the same for the purpose of this action as if Harlin had transferred the stock directly to the plaintiff.

"It is well settled that in an action of this kind, the plaintiff, in order to prevail must, [1] show that the defendant made a material statement or representation; [2] that such was false; [3] that when he made it the defendant knew it was false or made it recklessly without any knowledge of its truth; [4] that he made it intending that the plaintiff should act thereon; [5] that the plaintiff did act thereon and suffered injury thereby. Dennis v. Thomson, 240 Ky. 727, 43 S. W. [2d] 18. It remains, therefore, to see if the plaintiff has proven his cause of action in compliance with these conditions.

"[1] The evidence is amply sufficient to establish that the defendant represented the value of the stock to be $200 or more per share. The plaintiff so testifies, and other circumstances proven in the case amply corroborate his testimony to this effect. It is evident that the plaintiff did not accept this stock in the trade until after he had talked with the defendant about it, and the defendant's representation to him that the stock was selling for $200 or more per share, if nothing more than that, is in effect a statement that such was a proper valuation to be placed on the stock.

"[2] The evidence is ample to show this representation was false and untrue. The Trigg National Bank became insolvent in the early part of January, 1932, a little more than six months after this trade was consummated, and went into the hands of a receiver, who at the time of taking proof in the case was still administering the affairs of the bank. Necessarily, one of the principal questions in the case is whether or not the bank was insolvent in June, 1931, at the time of the transfer of this stock, and an important consideration to be determined is whether or not there can be a presumption or inference of insolvency in June, 1931, from the fact of insolvency in January, 1932, a period of slightly more than six months. Wigmore on Evi-

dence, sec. 382, lays down the rule as follows: 'The prior or the subsequent existence of such a fact is always evidential to show its existence at a time in issue, upon the general experience that such facts involve a human attitude more or less continuous and permanent. The probability of continuance depends much, of course, on the nature of the specific fact and the circumstances of each case; and, therefore, in setting a limit of time for a range of the evidence, the discretion of the trial court should control. The principle is illustrated by many sorts of facts. Such evidence is receivable to show the mode of conducting a business * * * the condition of solvency, and so on. The occasional repudiation of such evidence * * * is not to be taken as a negation of the general principle, but only as a determination that in the case in hand the contingencies of change were too many to allow the prior or the subsequent condition of things to be of probative value.'

"And this same author, at section 437, discusses also the legitimate inferences which may be drawn from proof of the prior existence of a condition or quality at a given time, that is, the inference may be drawn of the probable existence of continuance of this condition or quality at a later period. The Court of Appeals of Kentucky, in the case of Wood v. Commonwealth, 229 Ky. 459, 17 S. W. [2d] 443, has established the doctrine that proof of insolvency on a given date becomes the basis of an inference [not a presumption] that such insolvency existed prior thereto, but, of course, did not attempt to establish an arbitrary period of time to which such inference might be carried back. In that case, the court held that thirty-eight days was not too great a length of time for such an inference to be carried back, laying down the rule in this case as follows: 'But it is also insisted that it was error to admit the evidence because it related to conditions existing 38 days after the transaction from which this prosecution arises, and that presumptions do not run backward. Accurately speaking, the status of affairs when the firm closed its doors and ceased business became the basis of an inference and not a presumption that its insolvency then existed, and that the members individually

were about to suffer great loss when the stock was converted. The general rule with respect to presumptions is as submitted by the appellant, but there are exceptions to the rule, such, for instance, where the present condition is one that would not ordinarily exist unless it had also existed at the time as to which the presumption is invoked. 22 C. J. 92. The rule of presumptive or inferential evidence must always be administered along with the rule of reason. Had the shortage been of a small amount, or had the intervening period been of long duration, there would be logical grounds for appellant's contention. But, the facts considered, we think the evidence furnished grounds for, and that there was indeed a prima facie presumption or a reasonable inference of the existence of loss in the trading accounts and insolvency of the firm on the date of the transaction. This it was not attempted to overcome. See Wigmore on Evidence, Section 437. The evidence was competent.'

"From these authorities, it is well established that the fact of insolvency on a given date establishes the basis of a logical inference that such insolvency existed at a date prior thereto. The only difficulty in the application of this rule is to determine the length of time over which such an inference may be carried back, and, of course, the solution of this question depends on the state of facts proven in each particular case, and it is evident that no arbitrary rule or period of time can be established with reference thereto. In this particular case, in view of the fact that it was necessary to make a 100 per cent. assessment against the stockholders and in view of other evidence showing the worthlessness of a very large amount of paper held by the bank, the court is of the opinion that a period of time slightly more than six months is not too great a period of time over which to carry back this inference of insolvency.

"The other evidence referred to with reference to the worthlessness of paper held by the bank is the evidence of T. L. Hatchett in which he expresses his opinion that more than $90,000 of notes held by the bank are worthless and that of the other notes approximately $195,000 is very doubtful of collection.

"The defendant earnestly contends that this evidence is not competent, this contention being based principally on the grounds that this witness does not qualify himself from a standpoint of knowledge sufficiently to enable him to express a competent legal opinion on the solvency or insolvency of the various debtors of the bank obligated on these notes.

"However, an examination of the authorities reveals that an extremely liberal policy is adopted by the courts, and in particular by the court of this state, in the admission of testimony to prove a condition of insolvency, many of the authorities going to the extent that insolvency of an individual may be proved by reputation. The Court of Appeals of Kentucky has not passed directly on this proposition, but in the case of Vansant's Ex'x v. Gardner's Ex'x, 240 Ky. 318, 42 S. W. [2d] 300, held that a witness might give his opinion on insolvency on investigations made by him and that it is no objection that the witness' opinion is based partly on what was said by others.

"In that case the court held that in order to qualify the witness for the purpose of expressing his opinion on solvency or insolvency of an individual, it was only necessary that he show some knowledge as to the existence and ownership of property and this, the court is satisfied, the witness Hatchett has shown in this case.

"Mr. Hatchett is a member of the Glasgow Bar, who had made collection practice a specialty and who has a large practice along this line, and the court is satisfied that this witness has as wide a knowledge, if not a wider knowledge than any man in Barren county, with reference to the financial status of the residents of this county.

"In view of these considerations, the court has reached the conclusion that it is sufficient evidence to show that the bank was badly insolvent at the time of the transfer of the stock in question, and that, therefore, the statement or representation by the defendant to the plaintiff as to the value thereof was false or untrue."

To the above may be added the uncontradicted evidence that no change of material consequence in the

kind and character of notes the bank held at the time it closed had taken place since the previous June. To continue with the court's opinion:

"[3] The next phase of the case, that is, the burden devolving on the proof to show that defendant Harlin knew such representation or statement was false, is the problem in this case that is the most difficult of solution and presents a very perplexing and difficult question for the court to determine; but after long and careful consideration, I have reached the conclusion that the evidence is sufficient to show that such was the fact.

"It will be remembered that defendant Harlin had been a director and stockholder of this bank for many years. It is a matter of common knowledge that beginning with the year 1929, in which year occurred what is known as the 'big drought,' followed by the collapse of the stock market, there has been a steady decline in the value of all types of securities, and, further, a matter of common knowledge that many banks were hard pressed and in failing circumstances and that many had actually failed by June, 1931, in this state and elsewhere, and a general feeling of uneasiness prevailed in the financial world at this time.

"It is significant that after the death of the president of this bank, the defendant Harlin, a stockholder for many years, starts selling his stock in the early part of 1931. He made two sales prior to the one in controversy in this case, and the evidence further shows that he was attempting to sell other stock besides the sales actually made by him.

"These facts alone might not be sufficient in themselves to show that defendant Harlin was actuated by an unrevealed motive in getting rid of this stock, but taken in connection with the defendant's own testimony, I am constrained to believe that such was a fact.

"His testimony referred to is his denial of knowledge of anything like an approximation of the amount which the bank examiner had compelled the bank to charge off in April, 1931, on account of certain impaired bonds held by the bank, which amount was approximately $23,000. It is inconceivable to the court that a director of the bank

would not have at least had an approximate idea of this transaction. Other testimony of the defendant referred to is his attempted explanation of why he was getting rid of this stock, which explanation was that he was aiming to help out his sister, who had gotten into financial difficulties, by selling her stock for her and that he was merely selling it for this purpose, using his stock with the idea in mind that the sister's stock would be transferred to him to take the place of it. This explanation might probably be satisfactory, but there is a total failure in the record to show that such stock of his sister's was ever transferred to him in accordance with this plan of operation, and for these reasons the court is constrained to believe from the evidence that defendant Harlin knew that the bank was insolvent and was getting out from under.''

At this point, it may be stated that immediately after this suit had been filed the appellee took the deposition of the appellant J. H. Harlin as if on cross-examination. Harlin's ignorance of the controlling facts in the case was then profound, but after other proof had been taken, his memory seems to have been refreshed. However, his conduct in this regard shakes the confidence as to his candor when testifying. To continue with the court's opinion:

''There is no difficulty in determining that the proof meets the fourth and fifth conditions necessary to be shown by the plaintiff in order to fasten liability on the defendant because the proof shows that the defendant made the representation with reference to the value of the stock, knowing that the plaintiff was asking information for the purpose of determining whether or not he should take the five shares of stock and transfer the lot to Witty. The defendant knew the purposes of plaintiff's inquiry of him as to the value of this stock and must be held to have made the statement of representation as to its value with the intent that the plaintiff should act on same, which the plaintiff did and suffered the loss in question.

''In this connection, the defendant contends that the plaintiff did not act on the representation or statement of the defendant as to the value of this stock, and in support of this contention contends earnestly that he did not act until he had

inquired of Thomas Dickinson, cashier of the bank, as to the value of the stock. It is true that the evidence discloses that he did make this inquiry of Dickinson before the stock was delivered to him, but the evidence further discloses that at that time the plaintiff had already made up his mind as to the trade and the necessary papers to effectuate the trade had been prepared. The agreement had been made with reference to their trades definitely, prior to the time that plaintiff inquired of Dickinson as to the value of this stock, and the court is of the opinion that the evidence is ample to show that plaintiff relied on defendant's statement and closed the deal on the strength of same before making this inquiry of the bank cashier.

'Having come to the conclusion, as indicated above, that the plaintiff has met the burden imposed on him by showing the five conditions on which liability of the defendant to him must be predicated, it follows that plaintiff is entitled to judgment in this case against defendant J. H. Harlin.''

There is yet left the question whether or not the lower court was correct in sustaining the attachment issued herein and setting aside the conveyance of a certain tract of land by the appellant J. H. Harlin to his coappellant, Sadie Harlin, in April, 1931, but which conveyance was not put to record until the following October. As hereinbefore more fully set out, the evidence discloses that J. H. Harlin in April, 1931, had his attention sharply called by the national bank examiner to the tottering condition of the bond account of the bank of which he was a director and also to the unsatisfactory condition of many of the notes his bank held. Mr. Harlin in the beginning of the year 1931 held 50 shares of this stock, which he was from time to time selling and trying to sell from 2 to 2¼ for one. Obviously he knew that if the bank failed he would not only lose what he could get for this stock but would probably be responsible for $5,000 additional under the double liability statute (Ky. Stats. sec. 595). Early in 1931, he set out upon a campaign of disposing of his stock, and in April we find him transferring title to the property here in question from himself to his wife, but failing to put the deed to record for an additional six months, during which time he continued in his efforts to dispose of his

stock, some of which were successful. We also find him making a conveyance of property standing in his name to his son. Harlin claims that the property which he conveyed to his wife had been purchased with an inheritance obtained from her parents; but he does not say that the title to the property had been taken by him as trustee for his wife or that he was under any legal obligation to convey it to her or that he owed her for having invested her money in property, title to which was in his name; nor does he tell us how long this title was in his name, nor does he set out any facts from which it might be inferred that there was a resulting trust in favor of his wife. He admits that no consideration passed from his wife to him at the time of this conveyance. Hence it was a purely voluntary one. He declined, when asked to give any statement of his assets or liabilities, to do so, leaving the distinct impression with the reader of his testimony that he regarded his affairs in such a confused state as to render it impossible for him to give an adequate or clear statement of them. He admitted that he had not at the time he testified paid the assessment levied against him under the double liability statute for the bank stock he held at the time the bank closed. Further, in the instant case the judgment was superseded by his wife in so far as the judgment set aside the conveyance in question to her, but J. H. Harlin has not superseded the judgment nor has it been paid. As set out in the case of Shannon et ux. v. Duffield, 218 Ky. 770, 292 S. W. 322, 323, the statute (Ky. Stats. secs. 1907, 1907a) does not confine the right to attack voluntary conveyances only to those holding "existing liabilities." On the contrary, the right of a subsequent creditor to annul the conveyance and subject the property to his debt is expressly recognized by the statute, but as to such subsequent creditors the relief will not be afforded from the mere fact that the conveyance was voluntary. A subsequent creditor attacking such a conveyance in order to succeed must show that the conveyance was made with an actual fraudulent intent to defeat the subsequently incurred debt. As stated in the Shannon Case:

"It is equally well established that an actual fraudulent intent, in order to bring the case within the rule just stated [as supra], may be established by circumstances constituting what is known in the law as 'badges of fraud'; and, further, that such con-

veyances between persons occupying a confidential relation, which includes husband and wife, will be looked upon with suspicion, and particularly so when the conveyance includes all or the bulk of the debtor's property and leaves him insolvent.''

Under all the facts and circumstances, the lower court was warranted in coming to the conclusion that Harlin in conveying the property here in question to his wife in April, 1931, was actuated by the purpose of putting it beyond the reach of those to whom he had or was about to sell the stock which he held in the bank should he ever be called upon to answer to them for such sales. We have set out these facts and circumstances above— the campaign to sell his stock; the conveyance made at the time the bank examiner called his attention to the condition of the bank; the voluntary character of the conveyance; its concealment until the following October when it was put to record; the continuation of the campaign to sell the stock; his lack of candor in claiming that he was selling his sister's stock, when as a matter of fact he was selling his own stock; his refusal to state his financial condition; the implication of his insolvency —all badges of fraud as defined in the Shannon Case. Hence the trial court was warranted in sustaining the attachment and setting aside the conveyance as it did.

Finding no error in the judgment below, it is affirmed.