## Collins-Moore & Co. v. Clement.

(Decided Dec. 11, 1934.)

732

FINLEY F. GIBSON, Jr., for appellant.

JOHN A. LOGAN and VICTOR R. LOGAN for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The appeal is from a judgment on a verdict for $1,788.75, the sum paid for 265 shares of common stock of the Missouri-Kansas Pipe Line Company, purchased by the appellee, Robert S. Clement, through or from Collins-Moore & Co., appellant, which is a corporation and licensed broker and dealer in securities in Louisville. The stock was purchased in three lots on different occasions and under somewhat different circumstances.

Clement testified that Collins, a vice president of the appellant, was an old and trusted friend. At the time Clement resided in Kyrock, Edmonson county. In April, 1930, James Conn, a representative of Collins-Moore & Co., called and told him that Collins had sent him with a message that Clement should buy some of the Missouri-Kansas Pipe Line stock; that the Dupont interests were back of it; that it was earning $3 dividend a year; that it had a book value of something over $50; and he felt sure it would attain the value of $75 a share before the end of the year. On that day it was selling for $29.95 on the New York Curb Exchange. On Conn's urgent recommendation he agreed to sell some other stock and invest the proceeds in 15 shares of the Pipe Line Company's stock at $29.25 a share. A day or two later Collins wrote Clement a friendly letter expressing his personal indorsement of the investment and his belief in a good future for the stock. He ad-

vised Clement that he was holding a large block of it, and renewed his recommendation that Clement should sell his Cities Service stock and invest in this.

Within two months after the purchase of the 15 shares, the stock was selling for $36 a share and then dropped to $10. When the decline came Collins called Clement on the telephone from Louisville, as he testified, and told him not to be alarmed, that it was a "bear raid" and the stock had a book value of $72, and urged Clement to exhaust his resources and buy more of it, repeating that the Duponts were back of it and that the company was coming into Louisville to furnish that city with its gas supply. Clement arranged to buy 50 shares, but it went up to $22 before he bought it on August 6, 1930.

On February 13, 1931, Collins wrote Clement suggesting the hope that the opinions he was then about to give in the letter were correct. Continuing, he referred to some rumors respecting the connections of the company and its extension. The application for a receiver, which seems to have been made about that time, he said was giving no cause for worry. The writer expressed the opinion that, "We will all be pleasantly surprised at the price it will attain before 1931 is history." The letter also contained some general observations regarding the market and other things not material here. There was no recommendation or solicitation in the letter. However, on the strength of a letter received in December, 1931, from Collins, as Clement testified, he bought 200 more shares at $1.25 on February 5, 1932. That letter was read to the jury, but its consideration was withdrawn by the court as it contained no representation but only some expressions of opinion, coupled with the advice that the writer was buying some of the stock and was recommending that Clement also buy at that price.

Clement testified that in buying the second and third lots he relied upon the representations contained in Collins' letter of the previous April and his statements subsequently made, particularly as to the company's getting ready to supply Louisville with gas, for which Collins had said it had contracts and the necessary funds. Perhaps there were a few other statements scattered throughout the period, but they are immaterial.

From Clement it was developed, upon cross-examination, that after he acquired the first lot of 15 shares the market rose to about $36 within two months, as we have stated, and that he received stock dividend scrip which he sold for $8.76. This was a quarterly dividend and the equivalent of 2 per cent. within two months on an investment of $438.75. Another similar dividend was paid in September, 1930. His bank at Scottsville had accepted this 15 shares at the market price as collateral in substitution of 10 shares of Central Public Service Corporation stock, which the defendant then sold for him. The 50 shares bought in August, 1930, were accepted by Clement's bank in Brownsville in substitution for some Cities Service stock pledged as' collateral, which stock was also sold for about what he paid for the Pipe Line Company stock.

By this time Clement was apparently as anxious to buy as Collins was to sell, for before buying the 200 shares in February, 1932, Clement was writing Collins suggesting that he thought he should buy more of the stock and Collins was writing him not to do so. Thus on September 20, 1931, he wrote:

"I wish you would buy for me 150 shares of Missouri-Kansas unless you think it is going bankrupt. If I can get 150 that will put me in position to get out even if it ever should go to $10."

On October 1, 1931, he again wrote saying that he would like to secure 100 more shares of this stock, and in response Collins suggested delay. On December 14, 1931, after his return from New York, Collins wrote a letter of an encouraging nature and stated that since he was buying a few hundred shares at $1.25 he recommended that Clement buy at that price. On January 5, 1932, Clement wrote saying that he supposed Collins had not been able to buy any of the stock at $1, and suggested that he would raise his offer to 1⅛, "and if you have good reasons to believe that it is still o. k., and will probably go up raise it to 1¼. However, we will leave that to you to get it as cheap as you can. You, of course, are in better position to know what it is likely to do. Now, we still hear that Missouri-Kansas is bankrupt, but I feel like that if such were so or likely to be any ways soon you would know it and would not advise buying same." The secretary-treasurer of the defendant company wrote that Clement's letter to Collins had been

referred to him because of his absence from the city. He advised under the circumstances that he would continue bidding 1⅛ for the stock for several days, and in the event it did not sell down to that figure he would raise the bid to 1¼.

Such is the summary of all of plaintiff's evidence, except the testimony of a local man who described the extent of the Pipe Line Company in Kentucky and related that it was obtaining gas in the neighboring fields. It would seem apparent that the plaintiff failed to make out a case. He did not prove the falsity of any material representation. Indeed, there was little actual representation of fact other than that the Dupont interests were back of the stock, that it was earning $3 a share, and that it had a book value first of $50 and then of $72 a share. Nearly all the statements about which the plaintiff testified were in the nature of opinions of prospective value and of urgent recommendations to purchase. The plaintiff himself established the good faith of his friend by putting into the record his statements as to his own investment in the stock and his attitude in respect to the last block of 200 shares. The correspondence shows that Collins was then holding him off, and finally when he was willing to put more of his own money into it and because of that fact he recommended a similar purchase by Clement. The correspondence, it seems to us, does not disclose a purpose of one to defraud the other.

We now look to the evidence of the defense. The defendant company is a licensed broker, engaged in buying and selling securities upon commission. The plaintiff, Clement, began doing business with it in 1928. The stock sold was not its own. The first two lots was treasury stock and bought for the plaintiff through the company's fiscal agents in New York, and the last lot was bought on the open market through the defendant's New York representatives. All of it was acquired at the current price at which it was being sold that day on the New York Curb Exchange. The stock had the approval of the Commissioner of Securities of Kentucky. Collins testified that he had gone over the company's western territory inspecting its property. Appraising its cash and other resources and its current earnings, together with prospective earning power, he estimated the value to be from fifty to seventy-five dollars a share. However, he did not remember having

736

told Clement it would be selling for $75 by the end of 1931, although he did believe that to be true. On July 3d, Collins bought for his own company 1,047 shares at 33⅜. One of the well-known Dupont capitalists did become a director of the company before April, 1930. The stock had always paid dividends equivalent to $3 a share. The company's officers at the time were having negotiations with the Louisville city officials about bringing gas there as its lines were within 50 to 75 miles of that city, and according to statements of the company it then had over $27,000,000 of assets on April 1, 1930. There is quite a bit of detail evidence fortifying the various statements and conclusions which Collins had expressed to Clement. There was a denial of the statement that the defendant was the sole distributor of this stock in Kentucky. That denial is sustained by proof that it was being daily sold on the New York Curb Exchange, as we have stated.

It is commonly stated that there must have been proved six factors or elements in order to maintain an action for fraud and deceit in the sale of securities. Reduced to extreme terseness, they are: (1) Material representation; (2) falsity; (3) scienter or recklessness; (4) intention; (5) reliance; (6) injury. Southern Insurance Company v. Milligan, 154 Ky. 216, 157 S. W. 37; Dennis v. Thompson, 240 Ky. 727, 43 S. W. (2d) 18; Curd v. Bethell, 248 Ky. 127, 58 S. W. (2d) 261; Dolle v. Melrose Properties, 252 Ky. 482, 67 S. W. (2d) 706; Kentucky Electric Development Company's Receiver v. Head, 252 Ky. 656, 68 S. W. (2d) 1; Harlin v. Calvert's Adm'x, 253 Ky. 752, 70 S. W. (2d) 524; Annotations, 68 A. L. R. 635, 642; 73 A. L. R. 1120. There could be no claim that the market value of the stock was less than that at which it was sold. 22 C. J. 188, 929. The burden was upon the plaintiff. There is lacking from this record proof of any false material representation of an existing or past fact, which obviously carries with it an absence of proof of knowledge of falsity or reckless disregard of the truth of the matter. Not only did the plaintiff fail to prove falsity, but the defendant established substantially the truth of these things which the plaintiff said were misrepresented to him, except as to the book value. It is well recognized that prophecy, good-faith promises and opinions of future events or developments, or recommendations, however urgent, cannot form the basis of an action for fraud and deceit. Authorities, supra. It is very doubtful whether Clement

relied altogether upon any of the rather limited statements of fact made to him, although he undoubtedly had confidence in and relied upon the opinion and judgment of Collins, and at least in the first two purchases was influenced by his urgent recommendations. Most of the cases we have had of this character presented some motive of material financial gain or escape from loss on the part of the seller. The only anticipated or actual profit to the seller in this instance was the comparatively negligible commissions.

The evidence, to put it negatively, does not reveal a novice. Rather it reveals one of that innumerable flock of lambs who played the market with a hope of profit and, alas, lost his fleece. He went into these ventures with his eyes open and with knowledge of the vicissitudes of the game, as did many other more experienced but equally unfortunate investors in recent years who paid the penalty for similar shimmering false hopes and sadly mistaken judgments.

We are of the opinion that the court should have directed a verdict for the defendant.

The judgment is reversed.